W. R. Stephens Company v. Commissioner.
W. R. Stephens Co. v. Commissioner
Docket No. 22681.
United States Tax Court
1951 Tax Ct. Memo LEXIS 147; 10 T.C.M. (CCH) 688; T.C.M. (RIA) 51231; August 8, 1951
*147 R. H. Fryberger, Esq., and E. F. Bohne, C.P.A., c/o Haskins & Sells, 620 Marquette Ave., Minneapolis 2, Minn., for the petitioner. Gerald W. Brooks, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: Respondent determined deficiencies in income and excess profits tax for the calendar years 1944 and 1945 as follows: Excess
Year
Income Tax
Profits Tax
1944
$2,101.23
1945
$3,117.07
102.55
Petitioner by amended petition claims deductions for depreciation for the years 1944 and 1945 for 9 additional automobiles. It is also claimed that the gains on the sale of 4 of these automobiles in 1944 and the sale of 2 of these automobiles in 1945, previously included in ordinary income, should have been reported and taxed as capital gain. As a result of these adjustments petitioner claims an overpayment as follows: Year 1944 - Income Tax
$ 892.37
Excess Profits Tax
2,575.49
Year 1945 - Excess Profits Tax
1,495.24
$4,963.10
Less: Additional income tax for 1944
2,352.61
Net refund claimed
$2,610.49
Respondent, by a "Claim For Increased Deficiency," filed March 27, 1951, claims *148 in the alternative, such increased deficiency in income tax for the calendar year 1945, as may result from a decrease in the proposed deficiency in excess profits tax for the calendar year 1945. The issues for our determination are: (1) Whether automobiles sold by petitioner, a dealer in new and used automobiles, during the years 1944 and 1945 were automobiles held by petitioner and used in its trade or business, the sale of which resulted in capital gain, or whether the automobiles are property of a kind which would properly be included in the inventory of the petitioner if on hand at the close of the taxable year, or property held by the petitioner primarily for sale to customers in the ordinary course of its trade or business. (2) In the event the automobiles are property used in the trade or business, what then are the allowable deductions for depreciation and the proper amounts of capital gain? (3) Whether respondent is, in the alternative, entitled to the increased deficiency in income tax for the calendar year 1945. The case was submitted on a stipulation of facts and evidence. Such facts as are material are incorporated herein. Findings of Fact Petitioner is a *149 corporation organized under the laws of the State of Delaware, with its principal place of business in Minneapolis, Minnesota. Its income and excess profits tax returns for the years involved were filed with the collector of internal revenue for the district of Minnesota, at St. Paul. Petitioner operated under a franchise from General Motors Corporation for the sale of Buick automobiles, and in connection therewith maintained a service department, and bought and sold used automobiles. It maintained showrooms, salesrooms, garages, and service rooms at two addresses, one in Minneapolis, and the other in St. Paul. Effective January 1, 1942, the sale of 1942 model year automobiles was prohibited, except that sales to the Army, Navy, designated foreign governments and designated governmental agencies were permitted on a restricted basis after February 2, 1942. During the tax years in question petitioner sold new Buick automobiles and bought, serviced, conditioned, and sold used automobiles of all kinds and descriptions. It also sold and serviced various kinds of electrical and gas household appliances such as stoves, refrigerators, washing machines, and hot water heaters. In its *150 income tax return for the year 1944 petitioner deducted $2,850.83 as claimed depreciation on "service cars." This represented depreciation claimed to have accrued as follows: On 2 motorcycles
$ 186.89
On 2 GMC trucks
206.36
On 14 1942 model year Buick
automobiles
2,457.58
$2,850.83
In its income tax return for the year 1945 petitioner deducted $2,624.04 as claimed depreciation on "service cars." This represented depreciation claimed to have accrued as follows: On a Ford pick-up truck
$ 10.84
On a GMC truck
14.56
On motorcycles and trucks de-
scribed above
339.49
On 19 1942 model year Buick
automobiles
2,259.15
$2,624.04
Respondent, in his determination of deficiencies, disallowed the deduction claimed for depreciation of 14 Buick automobiles in the 1944 return in the amount of $2,457.58, and also the depreciation claimed on the 1945 return for the 19 Buick automobiles in the amount of $2,259.15 for the reason that they were property held primarily for sale to customers in the ordinary course of petitioner's business. In its 1945 income tax return petitioner reported a long-term capital gain of $14,151.92 on the sale of sixteen *151 1942 model year Buick automobiles. In his determination of the deficiency for the year 1945 the Commissioner determined that the sale of these sixteen 1942 model year Buick automobiles resulted in ordinary income, and further held that the income reported from the sale of the 16 automobiles was overstated by $3,734.43, the amount of previously deducted depreciation, which the Commissioner had disallowed in the same deficiency notice. In the deficiency notice the Commissioner explained his adjustment as follows: "(b) On your income tax return you reported gains from the sale of 16 Buick cars as gains from the sale of capital assets in the total amount of $14,151.92. It is held that inasmuch as these cars are property held primarily for sale to customers in the ordinary course of your business the sales of these cars resulted in ordinary income of $10,417.49. It is further held that the income reported on your return from the sale of these cars was overstated to the extent of $3,734.43. The taxable gain on the sale of these 16 Buick cars is computed as follows: Total selling price
$28,452.69
Less: Original cost
$17,797.04
Expenses
238.16
18,035.20
Ordinary net income
$10,417.49
*152 The 19 automobiles placed in issue by the original petition were purchased new from the General Motors Corporation during the latter part of 1941 for sale to customers. The 9 automobiles placed in issue by the amended petition were similarly acquired in 1941 with the exception of 2 - 1 of which was purchased new on January 14, 1942, and another was acquired March 10, 1942, from the Buick Zone, where it had been received for official use by a General Motors Corporation zone official. Petitioner claimed no depreciation on the 19 automobiles in the 1941, 1942 and 1943 returns. No depreciation was claimed in 1944 on 5 of the 19 automobiles; no depreciation was ever claimed between dates of acquisition and dates of sale on 6 of the 9 additional automobiles sold in 1944 and 1945, nor was depreciation claimed on 3 of the 9 additional automobiles which were on hand December 31, 1945. As to the 4 automobiles sold in 1944 and the 2 automobiles sold in 1945, the proceeds of the sales of these automobiles were included in gross sales in the 1944 and 1945 returns, and the gains on the sales were included as ordinary income. In connection with the sale of new automobiles, petitioner's practice *153 has always been to assign a certain number of new models to certain persons for certain pursposes, mainly to salesmen for use as demonstrators, and to a certain extent to officials, and some are used as "courtesy cars." The latter category generally refers to automobiles used for accommodation services, such as transporting customers to and from the garage or for temporary loans where the customer's car is in the petitioner's shop for repair and special need for a car in the interim is shown by the customer. During the years in question petitioner also used some of these automobiles in the sale and service of household appliances, for transportation of employees and in the purchase of used cars and parts. Under the franchise from General Motors petitioner was required to keep its records in accordance with the General Motors dealers standard accounting system. As the cars in question were received by petitioner they were accounted for in account number 231 - "New Cars Available for Sale." When they were placed in company use for the purposes outlined above, they were accounted for in account number 230 - "Company Cars." Two methods of financing the purchase of the automobiles were *154 used. The new cars were originally received by petitioner under the "floor plan" and held in trust. Under this plan petitioner was required to keep the cars new and they could be used only for display purposes. They were covered only by fire insurance. The General Motors Acceptance Corporation also had a plan of financing new cars under "demonstration agreements." Under this plan the dealer financed about 75 per cent of its cost of the new cars and was permitted to use them for demonstration, that is, to assign them to salesmen, or dealer-officials, or for "courtesy cars." These cars carried insurance coverage for fire, comprehensive and collision damage. The printed instructions on the back of each "Demonstration Agreement" form included the following statements: "Period of accommodation is not to exceed the number of months between date car is placed on demonstration and the next new model announcement. "Dealer Release Order should be used to remit monthly payments or to pay full amount when motor vehicle is released from Demonstration Agreement." Shortly after the 28 automobiles in question were received they were put under "demonstration agreements." Such transfer after *155 January 1, 1942, was prohibited by regulations of the Office of Production Management and later regulations of the Office of Price Administration. In normal times such use does not exceed one year before the cars are sold to customers, since the General Motors Corporation system of accounts does not contemplate financing a car for such use beyond the date on which the new models come out. In Minnesota, if a car is not used during the year, it is exempt from the state license tax. If it is used during the year the license tax must be paid and a license number procured. To gain exemption the car owner must file an affidavit that the car is not to be used during the calendar year. Such cars as were licensed were licensed in the name of petitioner. Of the 28 automobiles in issue, 1 was licensed only in 1942. Petitioner's application for a license for this car, dated January 11, 1946, states: "This car has been in dead storage since March 10, 1942. Previous to that it was used on our dealer plates and for demonstration only." Eight of the automobiles were not licensed in 1944, and of these 8, 3 have no record of being licensed in 1945. Upon the advice of outside auditors, as *156 of May 1, 1944, but actually during July, 1944, an entry was made in petitioner's "Fixed Asset Inventory and Depreciation Record," classification "Service Cars," showing 12 of the 28 Buicks in controversy as being subject to depreciation on the basis of a 48-month life. A thirteenth automobile was added July 11, 1944; and a fourteenth was added October 24, 1944. Ten of the automobiles had been assigned to company officials, and 4 were assigned as "courtesy cars" to the service departments, 2 in St. Paul and 2 in Minneapolis. None of the other 14 automobiles in controversy was entered in this record, either in 1944 or 1945, or at any other time. Under the General Motors dealers accounting system, petitioner had specific instructions not to carry current model Buicks as service cars. The following schedule shows the 1942 model year Buicks held by petitioner on the dates indicated, viz: Not in
Date
Issue
In Issue
Total
December 31, 1942
299
28
327
December 31, 1943
164
28
192
May 1, 1944
107
28
135
December 31, 1944
64
24
88
December 31, 1945
2
6
8
With respect to the 4 automobiles sold in 1944 and the 18 automobiles sold in 1945, *157 the increase in price of new passenger automobiles of $15 per month from January 1, 1942, to date of sale, allowed by Price Schedule 85, Office of Price Administration, was included in the selling price of each car. These automobiles were never put back into an inventory account by the company and then sold. They were all sold out of account number 285, or the fixed asset account. The 1942 model year Buicks here in issue, held by petitioner and sold during 1944 and 1945, were held primarily for sale to customers in the ordinary course of its trade or business. Opinion The primary question for our determination is whether the twenty-eight 1942 model year Buick automobiles held by petitioner, a dealer in new and used automobiles, were property used in the trade or business of a character defined in section 117 (j), Internal Revenue Code, which is subject to the allowance for depreciation provided in section 23 (l), or whether they come within the exceptions contained in section 117 (j) as being either (a) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (b) property held *158 by the taxpayer primarily for sale to customers in the ordinary course of its trade or business. Dependent upon the determination of this issue are the issues of the proper amounts of depreciation and capital gains for the years in question. We will first consider the primary issue of the character of the property. Petitioner contends that the 28 automobiles in issue, upon having been removed from the account "New Cars Available for Sale" and having been placed in the account "Company Cars", and thereafter having been assigned to particular persons or departments for use, constitute property used in its trade or business and thus are subject to depreciation and capital gains allowances. In order that petitioner come within this provision of the statute the burden is upon it to show (1) that the cars were used in its trade or business; (2) that they were subject to allowance for depreciation; (3) that they were held for more than six months; (4) that they were not property of a kind includible in the inventory of the taxpayer if on hand at the close of the taxable year; and (5) that the cars were not held by the taxpayer primarily for sale to customers in the ordinary course of *159 its trade or business. In the ordinary course of petitioner's business the automobiles obtained from General Motors Corporation are financed on two plans: the "floor plan" and the "demonstration plan." Under the floor plan the automobiles are required to be maintained in a new condition and used only for display purposes. Under the demonstration agreement petitioner is permitted to remove cars from the floor plan by executing an agreement that the automobile is removed for demonstration purposes and that it will be so used only until such time as a new model is placed on the market. Under the General Motors deealers accounting system petitioner is not permitted to carry current model Buicks as "service cars." Under these prohibitions, the use to which the automobiles were normally put, whether it be as courtesy cars, demonstrators or on assignment to company officials, is essentially in the nature of temporary demonstration or exhibition, after which they would be sold. These cars were not purchased with the intention of placing them in a "service car" use such as were the trucks and the motorcycles, a use which was prohibited. We can arrive at no other conclusion from the evidence *160 before us than that in a normal year it is the intention of petitioner to sell to customers the automobiles received new from General Motors, whether they are sold from the new car inventory or whether they become available for sale after temporary use as a demonstrator or "Company Car." It is our belief that the interim use of the automobiles during the demonstration period does not remove them from that class of property held primarily for sale to customers. The court in Albright v. United States (C.A. 8, 1949), 173 Fed. (2d) 339, cited by petitioner, considered the effect of transferring, for an interim period, hogs held for breeding purposes to the herd held for sale. The court concluded that such a temporary change did not affect the primary purpose for which the hogs were held, and said at page 345: "* * * The normal sale being of the whole herd, the herd is not only reduced in size but entirely removed from the taxpayer's business. Obviously, it can not be sold until it has returned to marketable condition, but the retirement of it for that period does not show that the taxpayer has not held it for the purpose of breeding and not primarily for sale for the time *161 required by the statute." By the same token in the instant case, transferring the automobiles, for an interim period, to demonstration and service car use does not show that they were not held primarily for sale. It was not within the normal operation of petitioner's business that the automobiles in issue were retained as company cars or demonstrators beyond the year in which they were current models. Their retention for a longer period by petitioner was brought about by the restriction on the production of automobiles and also by the regulations of the Office of Production Management and the Office of Price Administration. Use of the automobiles for purposes beyond which they were permitted by the demonstration agreement, such as service cars used by maintenance men in making service calls for repairing household equipment and using the automobiles in seeking out and purchasing parts and used cars, were not ordinary and were not sufficient to change their normal character nor to establish that they were a depreciable asset rather than stock in trade. Petitioner has not clearly shown wherein these automobiles were used in a manner which within the normal operation of its business *162 shows an intent to hold the cars primarily for a purpose other than sale. In our view it is for this purpose that the automobiles were originally acquired. No feature surrounds the original purchase of these automobiles by petitioner which would distinguish them from other new automobiles purchased and held for sale. Cf. United States v. Bennett (C.A. 5, 1951), 186 Fed. (2d) 407. Petitioner argues that the fact that the cars were originally placed in an account on its books known as "231 - new cars" does not establish their identity and the purpose for which they were held, citing Carl Marks & Co., 12 T.C. 1196, wherein the Court said: "* * * Certainly it can not be argued that securities once acquired for resale to customers must forever retain their dealer status, when in fact there has been a conversion of those securities from a dealer to an investment account. E. Everett Van Tuyl, 12 T.C. 900. The crucial factor to consider in determining the character of the securities involved is the purpose for which they were held during the period in question, and in this case we believe the facts show that those securities were held for investment *163 purposes after December 29, 1941." It is well settled that segregation of property in the accounting system of a taxpayer is evidence of an intention to separate the property but it is not conclusive. All of the circumstances must be considered. After a careful consideration of all the evidence before us, we can only conclude that there has not been a change in the activities of petitioner's business, nor in the purpose for which the automobiles were acquired, of a nature which would convert property held for sale, but temporarily used for other purposes, to property used in the trade or business. Having thus determined that the automobiles in issue were held primarily for sale to customers in the ordinary course of petitioner's business, it follows that the gain from the sale of these automobiles is ordinary gain. It is therefore unnecessary to consider the questions of the deductions for depreciation and the proper allowances for capital gains, or respondent's alternative claim. Decision will be entered for the respondent.